935 A.2d 865

COMMONWEALTH of Pennsylvania, Appellant

v.

Marlon LEE, Appellee.

Commonwealth of Pennsylvania, Appellant

v.

Alexander Drain, Appellee.

Supreme Court of Pennsylvania.

Argued Oct. 17, 2006.

Decided Nov. 21, 2007.

Hugh J. Burns, Jr., Philadelphia Dist. Attorney's Office, Peter Carr, for the Com. of PA, appellant.

Karl Baker, Defender Ass'n of Philadelphia, for Marlon Lee and Alexander Drain, appellees.

BEFORE: CAPPY, C.J., CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## *OPINION*

Justice BAER.

### I. Introduction

In *Commonwealth v. Gomer Williams*, 574 Pa. 487, 832 A.2d 962 (2003) (hereinafter *G. Williams*), this Court considered and rejected several constitutional challenges to Pennsylvania's Registration of Sexual Offenders Act, Act of May 10, 2000, P.L. 74, No. 18, *as amended*, 42 Pa.C.S. §§ 9791, *et seq.* (Megan's Law II).[1] Specifically, we held that the registration, notification, and counseling (RNC) requirements that attach, under Megan's Law II, to offenders deemed Sexually Violent Predators (SVP) are not punitive.[2] Because we found these

1. Megan's Law II is so denoted because the General Assembly's first enactment providing community notification and related provisions for specified sex offenders, Act of Oct. 24, 1995, P.L. 1079 (Spec. Sess. No. 1), largely was ruled unconstitutional by this Court in *Commonwealth v. Donald Williams*, 557 Pa. 285, 733 A.2d 593 (1999) (hereinafter *D. Williams*). Subsequently, the General Assembly enacted Megan's Law II, the constitutionality of which this Court substantially upheld in *G. Williams*, 574 Pa. 487, 832 A.2d 962, with the exception that we found invalid the penalty provisions that attached to sexually violent predators (SVP) who failed to comply with the provisions of the statute.

   In the wake of our invalidation, in *G. Williams*, of the penalty provisions that attach to non-compliant SVPs, the General Assembly once again amended Megan's Law, *see* Act of Nov. 24, 2004, P.L. 1243, No. 152, § 8 (Megan's Law III), addressed to these and other matters that we have cause to discuss, *infra*.

   In 2006, the General Assembly once again amended Megan's Law, principally to shorten from ten days to forty-eight hours the time period within which an offender, SVP or non-SVP, must notify state police of any change, *inter alia*, to the offender's residence, employment, or student status pursuant to 42 Pa.C.S. §§ 9795.2(a)(2), (a)(2.1), (b)(4), (b)(5). *See* Act of Nov. 29, 2006, P.L. 1567, No. 178, § 7 (effective Jan. 1, 2007).

2. *See* 42 Pa.C.S. §§ 9795.2(a) (requiring any sex offender to register with the Pennsylvania State Police upon release and furnish information pertaining to intended residency, employment, and student status, and, within forty-eight, to notify the state police of any changes in such information), 9795.2(c)(requiring the state police initially to inform local police in the municipality of the offender's intended residency, and subsequently to notify local police of any changes in status, or offender's non-compliance with any pertinent provision), 9795.3(4)(requiring any sex offender to provide fingerprints and a photograph to the Pennsylvania State Police), 9797 (in any case involving an offender, providing for notification of the victim, pursuant to requirements that

provisions to be non-punitive, we held that the full panoply of due process protections that attach where punishment is in the offing, *see Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),[3] are not constitutionally required. Therefore, we found no constitutional flaw with the prescribed SVP assessment procedure, which requires only that the prosecution demonstrate to the court (rather than a jury) by clear and convincing evidence (rather than proof beyond a reasonable doubt) that the offender suffers a "mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offense." 42 Pa.C.S. § 9792; *see G. Williams*, 832 A.2d at 984; *cf. Commonwealth v. Killinger*, 585 Pa. 92, 888 A.2d 592 (2005)(holding that the registration and community notification provisions applicable to non-SVP offenders also do not implicate *Apprendi*, because those provisions attach automatically upon conviction of a predicate offense and require no judicial factfinding by a diminished standard of proof).

In *G. Williams*, however, this Court expressed reservations in *obiter dictum*[4] regarding the lifetime duration of the registration, notification, and counseling requirements imposed on SVP.

> [O]ne of the most troubling aspects of the statute is that the period of registration, notification, and counseling lasts for the sexually violent predator's entire lifetime. *A reasonable argument could be made that, to avoid excessiveness, the Legislature was required to provide some means for a sexually violent predator to invoke judicial review in an*

vary according to whether the offender is an SVP), 9798 (providing for the conveyance of detailed notification pertaining to any SVP in a jurisdiction by local police to a broad array of recipients in the community).

3. In *Apprendi*, the United States Supreme Court held that, when any additional punishment beyond the statutory maximum sentence for the underlying offense hinges on factfinding in excess of that necessary to support the underlying conviction, except the fact of a prior conviction, such factfinding must be subject to determination by a jury by proof beyond a reasonable doubt. 530 U.S. at 490, 120 S.Ct. 2348.

4. "A judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential...." BLACK'S LAW DICTIONARY 1100 (7th Ed.)

*effort to demonstrate that he no longer poses a substantial risk to the community.*

832 A.2d at 982–83 (emphasis added). No record regarding these challenges had been developed in the lower court, however, so we remanded the case, directing the trial court to convene an evidentiary hearing and determine in the first instance whether the lack of judicial avenue for reassessment or the vagueness of the criteria underlying the SVP designation were unconstitutional, and to review appellant's other unresolved constitutional challenges as necessary. *Id.* at 986 & n. 27.[56]

Presently, we have before us separate decisions by two judges on the Court of Common Pleas of Philadelphia County, both finding unconstitutional the lifetime RNC provisions that apply to SVPs pursuant to Megan's Law. In *Commonwealth v. Lee,* the Honorable Carolyn Engel Temin ruled "that because Megan's Law II does not contain a provision allowing for reassessment of a defendant found to be a sexually violent predator at any time after sentence is imposed, the registration, notification and counseling sanctions of the statute are overbroad and violative of due process rights." *Lee* Tr. Ct. Op., 7/15/04, at 7. In *Commonwealth v. Drain,* the Honorable Anthony J. DeFino ruled that the failure to provide a mechanism for post-release reassessment of SVP status rendered the RNC provisions of Megan's Law II with respect to SVPs

5. Notably, as of this writing, the *G. Williams* litigation appears to be ongoing. Following our remand, the trial court denied Williams further relief without a hearing, a disposition the Superior Court found inconsistent with our remand order. *See Commonwealth v. G. Williams,* 877 A.2d 471 (Pa.Super.2005). Thus, the Superior Court remanded once again. This Court then denied the Commonwealth's Petition for Allowance of Appeal from that decision, finalizing the Superior Court's ruling. *See Commonwealth v. G. Williams,* 586 Pa. 770, 895 A.2d 1261 (2006) (*per curiam*).

6. In *G. Williams,* we also held that the sanctions prescribed by Megan's Law II for an SVP's non-compliance with the Act's RNC provisions, which provided a minimum penalty of lifetime probation, qualified as punitive, and were unconstitutional inasmuch as they came into play only upon judicial factfinding by clear and convincing evidence, in violation of *Apprendi.* We struck and severed those provisions, which have since been recodified and diminished. *G. Williams,* 832 A.2d at 985–86. Their validity is not presently before us.

excessive and therefore punitive in nature. Thus, Judge DeFino deemed the absence of the due process protections for defendants facing punishment violative of the United States Supreme Court's decision in *Apprendi.*

Because both courts deemed Megan's Law II repugnant to the United States Constitution, at least in part,[7] this Court has direct appellate jurisdiction pursuant to 42 Pa.C.S. § 722(7).[8] We begin by reviewing each of these decisions separately, although we analyze and reverse both in a unitary discussion.

## A. Commonwealth v. Lee (38 EAP 2004)

On June 18, 2003, Appellee Marlon Lee appeared before Judge Temin and pleaded guilty to charges of rape, attempted rape,[9] attempted involuntary deviate sexual intercourse,[10] two counts of possessing instruments of crime,[11] and two counts of unlawful restraint[12] arising from two separate bills of information. On October 15, 2003, Lee again appeared before Judge Temin and pleaded guilty to additional charges of rape, simple assault,[13] and possession of instruments of crime, arising from a third bill of information. Per the requirements of Megan's Law II, 42 Pa.C.S. §§ 9795.4(b), due to Lee's conviction of predicate offenses enumerated at § 9795.1(a)-(b),[14] the court

7. Neither court considered whether and to what extent the offending provisions were severable from Megan's Law II. *Cf., e.g., G. Williams,* 832 A.2d at 986 (holding certain penalties that applied to noncompliant SVP unconstitutional, but determining that those provisions could be severed from the rest of Megan's Law II). Because we reverse the trial courts' rulings, the question of severability is moot.

8. Section 722 furnishes this Court, *inter alia,* with exclusive jurisdiction over direct appeals from a decision of a court of common pleas holding "invalid as repugnant to the Constitution, treaties or laws of the United States, or to the Constitution of this Commonwealth, any treaty or law of the United States or any provision of the Constitution of, or of any statute of, this Commonwealth." 42 Pa.C.S. § 722(7).

9. 18 Pa.C.S. §§ 3121 (rape), 901 (criminal attempt).

10. 18 Pa.C.S. § 3123.

11. 18 Pa.C.S. § 907.

12. 18 Pa.C.S. § 2902.

13. 18 Pa.C.S. § 2701.

14. Specifically, Lee's guilty pleas to rape were sufficient to trigger the assessment. *See* 42 Pa.C.S. § 9795.1(b)(2).

deferred sentencing pending an assessment by the Sexual Offender's Assessment Board (SOAB). On January 10, 2004, the SOAB, relying on the report of Dr. Barry Zakireh, determined that Lee satisfied the criteria for designation as an SVP, *see* §§ 9794(c), 9795.4(b), and the court so designated him.

Following his SVP designation but before sentencing, Lee filed a Motion for Extraordinary Relief, contending, *inter alia,* that the SVP provisions of Megan's Law were unconstitutionally overbroad and excessively punitive relative to the remedial purpose of Megan's Law II. The court convened a hearing on April 16, 2004, at which it took testimony from defense expert Dr. Timothy Foley and Commonwealth expert Dr. Zakireh, the same SOAB member who had determined in the first instance that Lee satisfied the SVP criteria. Both physicians, the court noted, referred to a particular study purporting to find that the risk of sexual recidivism decreases in men as they age,[15] and both conceded, according to the court, "the larger the interval between the assessment and the release date of the offender the ... [more the] accuracy of the assessment decreases." *Lee* Tr. Ct. Op., 7/15/04, at 6. The court thus concluded that, "[w]ith the recognition that ... Lee is to be sentenced for a jail term of up to 20 years, this Court [is] convinced that Dr. Zakireh's assessment of Defendant Lee will, by his own admission, be inaccurate at the time that Lee is released from prison." *Id.* at 6–7.

Based on these findings, the court concluded that, because Megan's Law II does not contain a provision allowing for reassessment of a defendant found to be a sexually

---

**15.** R. Karl Hanson, *Age and Sexual Recidivism: A Comparison of Rapists and Child Molesters* (2001). The study, available online at the Office of the Solicitor General of Canada, *see* http://ww2.ps-sp.gc.ca/publications/corrections/pdf/age200101_e.pdf (last reviewed Oct. 9, 2007), provides no professional designation for Dr. Hanson beside his apparent affiliation with the Office of the Solicitor General. Elsewhere, however, he is identified as a Ph.D., discipline unspecified. *See Sexual Offender Recidivism,* Presentation to the Nat'l Ass'n of Sentencing Comm'ns, http://www.ussc.gov/STATES/2006conf/R% 20Karl % 20Hanson% 20Panel% 20_% 20Sex% 20Offenders% 20Research.pdf (last reviewed Oct. 9, 2007).

violent predator at any time after sentence is imposed, the registration, notification and counseling sanctions of the statute are overbroad[16] and violative of due process rights. According to Dr. Zakireh's own testimony, his assessment of ... Lee at this point in time would be inaccurate at the time that Lee is released from prison. Further, there was total agreement of the experts that the danger of recidivism decreases over the life of an individual[.] Given that the Supreme Court has found that the purpose of the statute is to identify the potential recidivist at the time of his release from prison and entry into the community, the failure of the statute to allow for reassessment as the defendant ages and to provide for reassessment of Defendant Lee's actual risk of recidivism at the time he is released is particularly fatal to the reliability of the assessment procedures in the statute.

*Lee* Tr. Ct. Op., 7/15/04, at 7. Thus, finding the SVP provisions of Megan's Law II constitutionally "over broad [*sic*] and excessive," the court granted Lee's Motion for Extraordinary Relief. *Id.* at 8.

### B.  Commonwealth v. Drain (15 EAP 2005)

On January 23, 2004, a jury convicted Appellee Alexander Drain of multiple counts of rape and related offenses, triggering the SVP provisions of Megan's Law II. Before the SVP assessment or his sentencing could occur, Drain raised a challenge to the constitutionality of the RNC provisions that attach, under Megan's Law II, to SVPs. Judge DeFino heard argument from the parties, and accepted briefs and exhibits pressing their respective points. Considering the case in light

16. Generally, overbreadth challenges, as such, arise only in the context of the First Amendment with regard to laws that proscribe constitutionally protected speech. *See United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("The fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an "overbreadth" doctrine outside the limited context of the First Amendment."). As noted *supra*, however, in light of contextual cues and the broader gravamen of her ruling, we read Judge Temin to mean only that the law in question is unreliable and thus excessive relative to its remedial objectives.

of the concerns we expressed in *G. Williams,* the court nonetheless concluded, by order dated December 10, 2004, that the provisions in question were constitutional.

The court rejected the "vagueness" challenges regarding the statutory definition for "sexually violent predator." Regarding the absence of a judicial reassessment provision, the court noted that, on November 24, 2004, Governor Rendell signed into law amendments to Megan's Law (Megan's Law III), including a provision granting SVPs a limited opportunity to petition for reassessment, no sooner than twenty years after the offender's release from incarceration.[17] The court ruled, in effect, that this amendment mooted any challenge predicated on the absence of an SVP reassessment procedure. *Drain* Tr. Ct. Op. I, 12/10/04, at 4–5. Regarding the lifetime counseling requirement, which the court recognized was not subject to termination under the newly-fashioned reassessment procedure, the court determined that the requirement did not render the statute unconstitutional, given "the egregious nature of the offenses embodied by the statute, the nature of the offenders themselves, and the legislative and

17. Specifically, Megan's Law III provides that SVP may petition for release from the sanction detailed at 42 Pa.C.S. § 9798 (providing for written notification by the chief law enforcement officer of a municipality in which an SVP takes up residence to, *inter alia,* the SVP's neighbors, the director of the county children and youth service agency, officials at area schools, the licensees of nearby certified day care centers, and the president of area colleges and universities), when at least twenty years have passed since the petitioner's release from prison or his most recent conviction in any jurisdiction of any offense punishable by more than one year of incarceration, whichever is later. *Id.* § 9795.5(b)(1). Upon receipt of the petition, the court must appoint counsel, order a reassessment by the SOAB, and convene a hearing, *id.* § 9795.5(b)(2)-(3), following which the court is to release the SVP from the requirements of § 9798 only upon a showing by "clear and convincing evidence that releasing the petitioner from application of § 9798 is not likely to pose a threat to the safety of any other person." *Id.* § 9795(b)(4). Notably, this provision does not release an SVP from the registration provisions, *id.* § 9795.2, requiring verification of his or her residence with the state police, *id.* § 9796, victim notification, *id.* § 9797, internet notification, *id.* § 9798.1, or the lifetime counseling requirements imposed by the Act on SVP at their own expense, absent a showing of inability to pay, in which case the responsible parole office shall pay. *Id.* § 9799.4.

judicial checks and balances safeguarding the [SVP] classification." *Id.* at 5.

Drain then sought reconsideration, which the court granted. Reversing its original resolution of the constitutional challenge with little explanation,[18] the trial court deemed Megan's Law's newly-provided amendment creating a limited judicial reassessment procedure for SVPs to be prospective only,[19] and thus irrelevant to Appellee Drain's challenge. Furthermore, the court observed, even if retroactive, the amendment "with its many built-in pitfalls is ... inadequate to meet [the] need for judicial re-determination." *Drain* Tr. Ct. Op. II, 2/11/05, at 6 (unnumbered). To support this claimed inadequacy, the court noted that, under the reassessment provision, an SVP would be denied access to a reassessment in the event that, nineteen years after release, he were arrested on "a non-related, nonsexual content crime" that incurred a possible sentence of one year or more, and would be forced to wait another twenty years to seek reassessment.

The court then found the provisions in question unconstitutional, concluding without elaboration that the absence of any mechanism for reassessment rendered the lifetime RNC requirements of Megan's Law II "excessive and thus punitive in nature." *Drain* Tr. Ct. Op. II, 2/11/05, at 5 (internal quotation marks omitted). The court also sharply rejected the Commonwealth's assertion that an SVP could petition the court for reassessment even in the event that the Megan's Law amendment was prospective only.

> The Commonwealth's assertion that if an offender feels he has been reformed and no longer is a predator [he] could petition the Court for declassification is fanciful and wholly

---

**18.** Indeed, everything preceding the court's sentence, "[i]n light of the above referenced case law [the court] finds as follows" is materially interchangeable between the two opinions. *Compare Drain* Tr. Ct. Op. I, 12/10/04, at 5 *with Drain* Tr. Ct. Op. II, 2/11/05, at 4.

**19.** It is not clear whether Judge DeFino ruled that the new provisions applied only to those whose SVP assessments followed the effective date of the new provisions, or whose crimes were committed after their effective date. Because the analysis that follows assumes that the new provisions applied to all SVPs upon its effective date, *i.e.* effectively is retroactive, we need not resolve this ambiguity.

ephemeral. There is no mechanism in the statute whereby an alleged reformed predator can obtain jurisdiction in any Court in the state. * * * * This Court readily believes that the same Commonwealth herein that so boldly posits that the "reformed predator" could easily petition the Court at the appropriate time and seek declassification would also be the same Commonwealth that would challenge the jurisdiction of any Court in the state that attempted to hear such a petition, citing lack of statutory authority in their argument.

*Id.* at 6.[20] This is the full extent of the trial court's discussion of its ruling, which leaves this Court with very little insight into precisely what in the record rendered, in the court's view, the lifetime RNC provisions so excessive relative to their express, remedial objective as to warrant designating them "punitive."

## II. Discussion

### A. *Commonwealth v. Gomer Williams* and *Apprendi v. New Jersey*

We begin our analysis by noting that, in both of the instant cases, the respective courts began their discussions by recounting our prior decisions on related challenges to Megan's Law, particularly those raised in *G. Williams* and *Commonwealth v. Maldonado*, 576 Pa. 101, 838 A.2d 710 (2003) (finding the "clear and convincing" standard of proof prescribed by

---

20. Notably, despite frequent revision, as of this writing Megan's Law continues to preserve what Appellee characterizes as language "vestigial" from Megan's Law I that hints at the prospect of "termination" of one's SVP status. *See* 42 Pa.C.S. § 9798(a)(1)(iv)(providing for notice by a municipality's chief law enforcement officer that contains, inter alia, "[a] statement that [the offender] has been determined by court order to be a sexually violent predator, *which determination has or has not been terminated as of a date certain* " (emphasis added)). "Termination" under any reasonable interpretation of the word is not a remedy expressly contemplated by any provision of Megan's Law II or III, the latter of which permits modification of some incidents of SVP status, but no relief from the status itself and certain other incidents thereto. Because no party before us has directly raised any argument that the statute contemplates, by this language, "termination" of SVP status, the claim is not before us.

Megan's Law II for the SVP determination constitutional under the due process clauses of the Fifth and Fourteenth Amendment, noting the impracticability of a "reasonable doubt" standard in that context). Thus, we begin by reviewing our decision in *G. Williams*.

In *G. Williams*, this Court faced various constitutional challenges to Megan's Law II, legislation the General Assembly enacted in response to our ruling in *Commonwealth v. D. Williams* substantially overturning Megan's Law I. *See generally G. Williams*, 832 A.2d at 965–68 (providing an account of the legislative and jurisprudential history spanning the enactment of Megan's Law I through the enactment of Megan's Law II and providing a substantive comparison of the two enactments). The trial court had determined that "the terms of the registration, notification, and counseling requirements are so burdensome upon the [SVP] that, as an objective matter, they rise to the level of punishment." *Id.* at 969. The trial court predicated its ruling, *inter alia*, on the effectively increased geographic range of the permissible dissemination of offender information *via* a provision calling for such dissemination by electronic means, including the internet. Similarly, the trial court also found probative of Megan's Law II's punitive nature its penalty provisions prescribing up to lifetime incarceration for an SVP's non-compliance with its RNC provisions.

Under the trial court's analysis, the designation of these provisions as punitive was dispositive under *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348, because, in that case, the United States Supreme Court held that any secondary factfinding that leads to an increase in punishment beyond the statutory maximum prescribed for the underlying substantive offense must be subjected to the same procedural protections as apply in assessing guilt of the underlying offense. Thus, in order to impose additional punishment for some aspect of the conduct of the crime, the determination would have to be submitted to a jury and the burden of proof beyond a reasonable doubt carried by the prosecution. Conversely, were the challenged

provisions to be found civil and remedial in nature, no such procedural protections would attach.

The trial court determined that, notwithstanding the legislature's express remedial intention, the RNC provisions that attach to SVP, especially viewed in light of the grave sanctions for non-compliance, were "retributive and punitive in nature regardless of legislative intent." *G. Williams*, 832 A.2d at 970. Thus, the trial court ruled that "the full panoply of constitutional rights must be attached to any sexually violent predator adjudication," *id.*, and found Megan's Law II unconstitutional under *Apprendi*.

In reversing the trial court's ruling, this Court accepted the trial court's initial premise. Specifically, we agreed that *Apprendi* controlled if (and only if) the RNC provisions that Megan's Law II prescribed for SVP were punitive in nature. Thus, in resolving the challenges then before us, we set about assessing whether the provisions in question were indeed punitive.

Traditionally, we began, the United States Supreme Court assesses a sanction's punitive character by a two-part inquiry that asks, first, "whether the legislature's intent was to impose punishment, and, if not, whether the statutory scheme is nonetheless so punitive either in purpose or effect as to negate the legislature's non-punitive intent." *G. Williams*, 832 A.2d at 971 (citing, *inter alia*, *Allen v. Illinois*, 478 U.S. 364, 368–69, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986)). Given the express intention animating Megan's Law II, we made fast work of the first question, accepting at face value as evidence of its non-punitive intention the legislature's "Declaration of policy," which has remained unchanged through successive revisions of Megan's Law:

> It is hereby declared to be the intention of the General Assembly to protect the safety and general welfare of the people of this Commonwealth by providing for registration and community notification regarding sexually violent predators who are about to be released from custody and will live in or near their neighborhood. It is further declared to

be the policy of this Commonwealth to require the exchange of relevant information about sexually violent predators among public agencies and officials and to authorize the release of necessary and relevant information about sexually violent predators to members of the general public as a means of assuring public protection *and shall not be construed as punitive.*

42 Pa.C.S. § 9791 (emphasis added); *see G. Williams,* 832 A.2d at 971–72 (citing and approving this Court's ruling in *Commonwealth v. Gaffney,* 557 Pa. 327, 733 A.2d 616, 619 (1999), that § 9791 manifests the legislature's non-punitive intent).

Accordingly, we proceeded to consider "whether the statutory scheme is ... so punitive either in purpose or effect as to negate the legislature's non-punitive intent." *G. Williams,* 832 A.2d at 971. In doing so, we were guided by the seven factors identified by the United States Supreme Court in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), as informing that determination:

(1) [W]hether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

*G. Williams,* 832 A.2d at 972–73 (citing *Mendoza–Martinez,* 372 U.S. at 168–69, 83 S.Ct. 554). Our analysis of these factors was lengthy and painstaking, *see id.* at 972–83, but for present purposes it suffices to observe that we held that the first six *Mendoza–Martinez* factors militated against finding Megan's Law II punitive.

We also found the seventh factor—concerning the provisions' excessiveness relative to the asserted non-punitive in-

tent—to be insufficiently established on the record before us, but allowed that such a challenge might lie given proper evidentiary development. Indeed, we observed the abovementioned "troubling aspect" of the statute, which spawned the instant challenge. To wit, we commented that

> one of the most troubling aspects of the statute is that the period of registration, notification, and counseling lasts for the sexually violent predator's entire lifetime. A reasonable argument could be made that, to avoid excessiveness, the Legislature was required to provide some means for a sexually violent predator to invoke judicial review in an effort to demonstrate that he no longer poses a substantial risk to the community. This aspect of the statute may be particularly problematic if the definition of "sexually violent predator" is incapable of reasonably precise implementation.... Notably, however, the position that a means for subsequent judicial review is a necessary feature of any valid registration/notification scheme assumes that, given sufficient time and/or treatment, sexually violent predators can be fully cured of the "mental abnormality or personality disorder [making them] likely to engage in predatory sexually violent offenses." 42 Pa.C.S. § 9792 (defining "sexually violent predator").

G. Williams, 832 A.2d at 982–83 (ellipses added; other modification in G. Williams). Thus, we remanded the record before us for further evidentiary development regarding the constitutional effect of the lack of judicial remedy and for consideration of the then-unanswered challenge concerning whether Megan's Law II is unconstitutionally void for vagueness.[21]

---

21. In G. Williams we left it less than clear whether the remand was to encompass a stand-alone vagueness challenge, or just a challenge that the vagueness of the statutory definition of what comprises an SVP, alone or in concert with the lack of judicial avenue for reassessment, rendered the RNC provisions so excessive relative to their remedial objectives as to warrant a finding of punitive effect. To the extent the pure vagueness challenge remained in the wake of G. Williams, this Court has lain it to rest in Commonwealth v. Dengler, 586 Pa. 54, 890 A.2d 372 (2005), for reasons we explain, infra. Thus, in the inquiry that remains, we consider vagueness only to the extent it informs our excessiveness analysis.

This case presents a variation on the challenges presented in *G. Williams*, and unlike in our former case, here we have a record reflecting Appellees' effort, successful in the lower courts, to provide evidence in support of the argument that the RNC provisions of Megan's Law II are punitive because they are unduly excessive relative to the legislature's stated non-punitive purpose. Thus we are in a position to evaluate the validity of the challenge we effectively invited in *G. Williams*.

## B. Ripeness and Mootness

■ Although this discussion brings us up to date with regard to this Court's Megan's Law jurisprudence and the legal background of the substantive issue now before us, we cannot take up the merits until we consider two challenges to the instant matter's justiciability. Specifically, the Commonwealth argues, first, that Appellees' claims were not ripe in the courts below because Drain, having never been designated an SVP, and Lee, whose release is not imminent, have only conjectural standing to challenge the SVP provisions of Megan's Law II by virtue of those factors.[22] *See Commonwealth v. Klobuchir*, 486 Pa. 241, 405 A.2d 881, 884 n. 5 (1979)("[B]ecause appellant stands unconvicted and unsentenced, the constitutionality of any enhanced sentence appellant might receive if convicted is a question not ripe for our review."). Secondly, the Commonwealth contends that the issues raised, in particular the punitive effect of providing no judicial avenue for SVP reassessment, have been answered by the legislature's provision, in Megan's Law III, of just such a remedy. *Cf. Pittsburgh Palisades Park, LLC, v. Commonwealth*, 585 Pa. 196, 888 A.2d 655, 659 (2005)("The courts in our Commonwealth do not render decisions in the abstract or offer purely advisory opinions; consistent therewith, the requirement of standing arises from the principle that judicial intervention is appropriate only when the underlying controversy is real and

22. In fact, the Commonwealth makes the non-designation claim as to both Appellees, neglecting to note that Appellee Lee actually was designated an SVP before Judge Temin addressed his challenge to the SVP provisions of Megan's Law II.

concrete[.]" (internal quotation marks and modifications omitted)). Neither of these circumstances has the effect the Commonwealth asserts, for the reasons that follow.

Regarding the instant claims' ripeness, the Commonwealth maintains that, at a minimum, only upon an offender's assessment as an SVP, and quite possibly not until his release from prison triggering the RNC provisions of Megan's Law, does he suffer an injury sufficient to render the question of the assessment's constitutionality ripe for review. Appellees counter that, because a challenge to the SVP assessment process under *Apprendi* goes to the constitutionality of the process itself, rather than the status as applied to a given party, their challenge ripened as soon as they were convicted of predicate offenses triggering the mandatory SVP assessment. Appellees further note that this Court addressed the procedurally analogous challenges raised in *G. Williams* notwithstanding that the offender there had not yet been deemed an SVP. 832 A.2d at 492–93 (noting that Williams challenged the provision following the trial court's order directing the SOAB to assess Williams).

We agree with Appellees that this matter is ripe for review. The instant questions, in going to the punitive effect of the obligations that attach upon an SVP assessment, raise constitutional concerns about the statutory assessment procedure itself under *Apprendi,* discussed *supra.* There is nothing speculative about the fact that, under Megan's Law II, Appellees must be assessed by the SOAB upon their conviction of predicate offenses and prior to sentencing. Indeed, Appellee Lee has been designated an SVP, and the Commonwealth's argument based upon the lack of such an assessment is non-responsive as to his case. *See supra* n. 22. Given that this assessment precedes and may well influence sentencing, there is simply no question that addressing the issue now, rather than after sentencing or upon release from prison, is appropriate. *See G. Williams, supra* (treating as ripe the constitutional claims of an offender identically situated to Appellee Drain in this case).

■ We also find unavailing the Commonwealth's claim that the limited and heavily circumscribed judicial reassessment procedure provided in Megan's Law III renders this case moot by effectively answering Appellees' challenge to the lack of such a mechanism. There are several flaws in this claim. First, while the reassessment provision, as applied to SVPs, does provide for termination of notification of various individual and institutional members of an SVP's community of the SVP's residency in that area,[23] it does not provide an SVP with relief from having his name and virtually every detail of his crimes and of his current residency, appearance, employment, student status, and other information posted on a publicly available website. *See* 42 Pa.C.S. § 9798.1. Moreover, Megan's Law III's reassessment procedure provides relief from neither the burdensome registration requirements nor the lifetime monthly counseling requirements. Thus, it would require an incomplete accounting of the concerns we noted and left open in *G. Williams* and the arguments now before us to suggest that this limited remedy moots the much broader claims of punitive sanctions, given the considerable burdens imposed under the requirements from which an SVP can have no relief under Megan's Law II or III, and the particular stigma that attaches by virtue of having every pertinent personal detail and a full accounting of an SVP's crimes publicly available on the internet in perpetuity. Accordingly, we address the Commonwealth's challenge to the trial courts' rulings on the merits.

## C. Excessiveness

■ We begin our substantive analysis, as we must, with the observation that all lawfully enacted Pennsylvania legislation enjoys, in this and all courts of this Commonwealth, a general presumption of constitutionality. *G. Williams*, 832 A.2d at 973; *Commonwealth v. Stern*, 549 Pa. 505, 701 A.2d 568, 571 (1997). Because the instant inquiry presents a ques-

---

**23.** Under Megan's Law III, non-SVP offenders subject to lifetime registration, *see* 42 Pa.C.S. § 9795.1(b), and to internet notification, *see id.* § 9798.1, may petition for release from internet notification. *Id.* § 9795.5.

tion of law, the scope of our review is plenary and we review the lower courts' legal determinations *de novo. Borough of Heidelberg v. WCAB (Selva)*, 928 A.2d 1006, 1009 (Pa.2007).

Regarding the seven aforesaid *Mendoza–Martinez* factors, the last of which lies at the heart of the following discussion, this Court has observed, "Although neither exhaustive nor dispositive, this list of factors has proved helpful in considering whether a civil, remedial mechanism nevertheless provides for sanctions so punitive as to transform what was clearly intended as a civil remedy into a criminal penalty." *G. Williams*, 832 A.2d at 972 (internal quotations and modifications omitted). In *G. Williams*, this Court, specifically in the context of Megan's Law II, signaled its willingness to entertain a showing based solely on excessiveness relative to intended remedial aims. *But see Hudson v. United States*, 522 U.S. 93, 101, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (quoting *Mendoza–Martinez*, 372 U.S. at 169, 83 S.Ct. 554) (suggesting that "no one factor should be considered controlling as they 'may often point in differing directions' ").[24] "[O]nly the 'clearest proof' that a law is punitive in effect," however, "may overcome a legislative categorization to the contrary." 832 A.2d at 973. "[W]e understand the 'clearest proof' standard to indicate that the *Mendoza–Martinez* factors must weigh heavily in favor of a finding of punitive purposes or effect ... to negate the General Assembly's intention that the Act be deemed civil and remedial." *Id.*

The Commonwealth raises numerous arguments for reversal. Pursuing the analytic framework outlined above in connection with our review of *G. Williams*, the Commonwealth

---

**24.** There is some tension between the *Hudson* language and our own suggestion in *G. Williams*, which postdated *Hudson* by over five years, that the last *Mendoza–Martinez* factor alone might render Megan's Law unconstitutional provided an adequate showing. We nonetheless suggested in *G. Williams* and maintain now, if only *arguendo*, that a showing of sufficient excessiveness in Megan's Law II's RNC provisions might warrant a finding that those provisions are punitive. Nevertheless, ultimately we conclude that the RNC provisions are not so excessive relative to their objectives to be punitive. Hence, the precise propriety of our prior invitation relative to the decisions in *Mendoza–Martinez* and *Hudson* is a knot we need not untangle.

contends that the trial courts erred in ruling that Appellees satisfied their burden to show by "the clearest proof" that the lifetime RNC provisions that apply to SVPs for life are punitive notwithstanding the legislature's express, contrary intent. The Commonwealth argues that Appellees'

> vague evidence that it was "possible" for "some" unspecified sexual predators to be "rehabilitated" someday did not demonstrate by the clearest proof that even this *one* factor was in [their] favor, much less that the supposed excessiveness was so extraordinarily oppressive as to both outweigh every other *Mendoza–Martinez* factor and negate the legislature's express non-punitive intent.

Commonwealth's Brief at 23.[25] Given the countervailing evidence on which the General Assembly relied, the Commonwealth maintains, "the legislature was entitled to find that it could not confidently be discerned at future hearings which such offenders, if any, were sufficiently 'rehabilitated' as to pose no substantial threat of further predation." *Id.* at 24.

The Commonwealth further contends that the RNC provisions that apply to SVPs constitute a constitutionally permissible "regulatory scheme of universal application" for all such offenders, and as such need not feature a mechanism to allow SVPs to seek reassessment. *Id.* (citing *Hawker v. New York,* 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (upholding a state law imposing a lifetime bar on convicted felons from practicing medicine)). It also cites this Court's decision in *Maldonado,* 576 Pa. 101, 838 A.2d 710, as providing that the mere specter of a regulatory scheme's overinclusiveness does not conclusively bar a classification, provided that the danger associated with overinclusion is outweighed by the countervailing risk to the public of underinclusiveness. Indeed, the Commonwealth observes that in *Maldonado* we approved the employment of an intermediate, clear and convincing standard of proof in the SVP assessment process even where the

**25.** Although the Commonwealth submitted separately bound briefs for each of the cases consolidated before this Court, they are indistinguishable in the substance and pagination of their argument sections, hence the page citations used in this Opinion apply to both briefs.

consequences of designation as an SVP may be severe and irreversible, and notwithstanding the acknowledged likelihood of overinclusiveness.

The Commonwealth also directs our attention to the United States Supreme Court's decision in *Smith v. Doe*, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), upholding Alaska's Megan's Law equivalent, Alaska Stat. §§ 12.63.010, *et seq.*, which mandates lifetime registration for anyone convicted of one aggravated sexual offense or two or more non-aggravated sexual offenses. In that case, the Court effectively endorsed Alaska's legislative finding that sex offenders present a substantial risk of recidivism, and approved the imposition of a rule of universal application, notwithstanding that any individual offender may well be rehabilitated. *Smith*, 538 U.S. at 103–04, 123 S.Ct. 1140. Thus, according to the Commonwealth, the Court approved severe sanctions even absent an individualized prediction of future dangerousness. Because Pennsylvania's Megan's Law II is, in its view, less inclusive than Alaska's mandatory registration regime, the Commonwealth argues that the provisions challenged in the instant cases fall well within the territory identified as constitutionally proper by the Court's *Smith* decision, fatally undermining the trial courts' rulings.

Appellees [26] first resist the Commonwealth's characterization of Megan's Law II's RNC provisions as rules of universal application on the basis that, unlike the statute at issue in *Smith*, the rule in Pennsylvania applies only to individuals deemed by the court after a separate proceeding to be sufficiently dangerous to warrant the SVP designation, and that it is this particularized finding of dangerous that SVPs ought to be able to contest upon release and thereafter. Appellees point to the United States Supreme Court's decision in *Seling v. Young*, 531 U.S. 250, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001), in which the Court rejected a Washington state civil commitment regime for SVPs, despite having upheld a fundamentally similar Kansas system in *Kansas v. Hendricks*, 521 U.S. 346,

26. Appellees, both of whom are represented by the Defenders Association of Philadelphia, submit a joint brief.

117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), essentially on the basis that Washington authorities were failing to provide the "adequate care and individualized treatment" that presumably were the very point of committing sexually violent offenders to confinement. Appellees also observe that the *Hendricks* Court emphasized that committed offenders must be permitted to seek annual examinations of their condition so that they might demonstrate that their condition is so changed that they are not likely to engage in predatory acts of sexual violence. Appellees maintain that the continuing incidents of SVP status under Pennsylvania's Megan's Law II are, like the commitment regimes in *Seling* and *Hendricks,* onerous and predicated on the notion of rehabilitation of sex offenders, and thus require the allowance of periodic reassessments to determine whether such rehabilitation has been effective.

Similarly, Appellees dispute the Commonwealth's argument that they have failed to demonstrate by the clearest proof that the means of RNC provisions under Megan's Law II are so disproportionate to their purported ends that they in fact meet our invitation, in *G. Williams,* to revisit the effect on the seventh *Mendoza–Martinez* factor for punitive effect relative to remedial purpose. What follows in Appellees' brief are fifteen-pages reviewing the evidence adduced by Appellees at their respective hearings, which they claim demonstrates that the risk of recidivism for certain sexual offenses diminishes incrementally with time through offenders' middle-age, and then drops off precipitously as offenders enter old age. Thus, Appellees maintain, they satisfied the showing called for by *G. Williams* that any Megan's Law II registration regime must allow for reassessment.

Appellees then turn to their remaining substantive arguments. Principally, Appellees contend at some length that the terminological imprecision and deficiencies as a predictive tool of the SVP designation procedure render the entire SVP assessment so vague that it is, in effect, punitive. Their analysis focuses on five perceived problems, which distil to the following three averred infirmities: (1) "the vague and tautological nature of the definition of 'sexually violent predator;' "

(2) the fact that the SOAB assessor often conducts his assessment without examining the offender; and (3) the difficulties inherent in predicting at the time of the assessment how dangerous an offender will be upon discharge at some relatively remote time, following years, or even decades of incarceration and treatment.

Appellees argue that Pennsylvania's definition of "sexually violent predator" is vague and circular. They note that, facially, the definition incorporates only two elements, conviction of a predicate offense and the existence of a mental state reflecting a likelihood that the offender will, unfettered, "engage in predatory sexually violent offenses." Appellees reject the terminology of "mental abnormality" as "all encompassing" and "personality disorder" as vague.[27] Appellees argue that this definition gives the factfinder "unfettered leeway to make arbitrary decisions when categorizing an accused as a sexually violent predator." Brief for Appellees at 60.

Appellees also contend that Pennsylvania's SVP assessment process is critically flawed insofar as it occurs before sentencing. This timing, Appellees claim, presents an offender with an intractable choice between submitting to an exam and potentially incriminating himself prior to sentencing, when he still enjoys constitutional protection against doing so,[28] or declining to permit himself to be examined by the prosecution, effectively forcing an assessor to work exclusively from the

---

**27.** These terms derive directly from the definition of sexually violent predator as one who suffers from "a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses." 42 Pa.C.S. § 9792.

**28.** *Compare Mitchell v. United States*, 526 U.S. 314, 328, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) ("The normal rule in a criminal case is that no negative inference from the defendant's failure to testify is permitted. We decline to adopt an exception for the sentencing phase of a criminal case with regard to factual determinations respecting the circumstances and details of the crime." (citation omitted)) *with Commonwealth v. Burton*, 451 Pa. 12, 301 A.2d 675 (1973) (declining to find a right to counsel in a presentencing interview, because that interview "is not an undertaking by the police to elicit incriminating statements, but rather it is designed to help the sentencing judge impose a fair and just sentence").

record rather than the personal exam favored by clinical norms.

Finally, Appellees reaffirm the argument that animated Judge Temin's ruling below-that an assessment aimed chiefly at anticipating future dangerousness should be conducted nearer in time to the offender's release from prison, rather than before a prisoner serves what, in many cases involving an SVP assessment, will be a lengthy prison term. Appellees reinforce Judge Temins' determination that, even by the testimony of the Commonwealth's own expert witness, any effort to predict future dangerousness or the likelihood of recidivism inherent in a given SVP will decrease in reliability proportionally with the remoteness in time from the assessment.[29][30]

■ The number of arguments raised by Appellees tends to obscure that Appellees succeed only if we accept the premise, which we have all but categorically rejected in our prior cases, that the registration, notification, and counseling provisions of Megan's Law II are punitive in the constitutional sense, thus requiring observance of all the due process protections that attend criminal prosecution, especially those identified by the United States Supreme Court's decision in *Apprendi*. For the reasons that follow, it is this initial premise that we cannot

29. Notably, Dr. Zakireh's testimony for the Commonwealth painted a far more complicated, and less bleak picture of the SVP assessment's utility than the trial court described. In particular, while Dr. Zakireh conceded that an assessment becomes less reliable in predicting recidivism as the time in question (post-release) becomes more remote from the time of the assessment (pre-sentencing), Notes of Testimony, 4/16/04, at 101–03, he never agreed that, at any future time, the assessment would become entirely invalid as a predictive tool, a claim Judge Temin ascribed to Dr. Zakireh in her opinion.

30. Appellees also assert violations of the constitutional prohibitions against double jeopardy, *see generally Commonwealth v. Mullins*, 591 Pa. 341, 918 A.2d 82 (2007), and imposition of *ex post facto* increases in punishment. *See generally Coady v. Vaughn*, 564 Pa. 604, 770 A.2d 287 (2001). These arguments necessarily proceed from the premise that the complained-of sanctions are punitive as a matter of law. Were we so to conclude, however, Appellees' *Apprendi*-based due process arguments would prevail, as the trial courts concluded, and we would find it unnecessary to reach Appellees' other constitutional arguments. Since we conclude that the RNC provisions that attach to SVPs are not punitive, however, all of these arguments necessarily fail.

accept on the records before us, and our inability to find support for that premise compels our reversal of the trial court opinions.

We begin our analysis by reviewing the legislative findings that the General Assembly furnished in support of its enactment of Megan's Law:

(a) **Legislative findings.**—It is hereby determined and declared as a matter of legislative finding:

(1) If the public is provided adequate notice and information about sexually violent predators and certain other offenders, the community can develop constructive plans to prepare themselves and their children for the offender's release. This allows communities to meet with law enforcement to prepare and obtain information about the rights and responsibilities of the community and to provide education and counseling to their children.

(2) These sexually violent predators pose a high risk of engaging in further offenses even after being released from incarceration or commitments and that protection of the public from this type of offender is a paramount governmental interest.

(3) The penal and mental health components of our justice system are largely hidden from public view and lack of information from either may result in failure of both systems to meet this paramount concern of public safety.

(4) Overly restrictive confidentiality and liability laws governing the release of information about sexually violent predators have reduced the willingness to release information that could be appropriately released under the public disclosure laws and have increased risks to public safety.

(5) Persons found to have committed such an offense have a reduced expectation of privacy because of the public's interest in public safety and in the effective operation of government.

(6) Release of information about sexually violent predators to public agencies and the general public will further the governmental interests of public safety and public scrutiny of the criminal and mental health systems so long as the information released is rationally related to the furtherance of those goals.

42 Pa.C.S. § 9791(a). These findings are clear, and notably absent is any comment regarding rehabilitation of offenders, a core premise underlying Appellees' arguments from the *Seling* and *Hendricks* cases, in which the United States Supreme Court found the rehabilitative aspect of the indefinite civil commitments imposed on certain sexual offenders to require periodic reassessments of offenders' status following treatment. Distinguishing these cases from the instant case, however, is the fact that they both concerned assertedly civil commitments, and thus reflected an absolute restraint on offenders' freedom. Our Megan's Law, of course, imposes nothing on released SVPs that even approaches confinement.

*Seling* and *Hendricks* being distinguishable on that basis, the instant case is most informed by the United States Supreme Court's decision in *Smith*. In that case, Alaska's equivalent to Megan's Law imposed on certain sex offenders released from prison a ten-year requirement of registration with local authorities and public notification, by electronic means, of information comparable to that made public under Pennsylvania's Megan's Law II. On released aggravated sex offenders, it imposed lifetime notification and registration obligations without the possibility of relief.

Finding that the Alaska legislature's intention had been to create a remedial, non-punitive scheme, as we already have with regard to Megan's Law II, *see G. Williams*, 832 A.2d at 971–72,[31] the Court analyzed the registration and notification

31. In *Smith*, the High Court's analysis of the legislature's intent was far lengthier than our prior analyses have been on that question under Pennsylvania law evidently because the Alaska legislature's intent was not as clearly stated as was the General Assembly's in formulating Pennsylvania's corollary provisions. In any event, the parties to the instant litigation do not dispute the General Assembly's non-punitive intent, nor could they in light of our prior decisions.

provisions in light of the *Mendoza–Martinez* factors to determine whether the statute was punitive notwithstanding the legislature's contrary intent. In applying the seven *Mendoza–Martinez* factors, the Court emphasized that those factors are "neither exhaustive nor dispositive." *Smith*, 538 U.S. at 96, 123 S.Ct. 1140 (quoting *United States v. Ward*, 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). Nevertheless tracking those factors in its analysis, the Court rejected, in turn, arguments that notification was tantamount to colonial-era, "shaming" punishments, *id.* at 97–99, 123 S.Ct. 1140, and that onerous registration requirements were an affirmative disability or restraint, *cf. Seling, Hendricks, supra*, noting that the provisions neither imposed a physical restraint nor were even as onerous as the various debarments the Court had formerly found remedial and non-punitive, *Smith*, 538 U.S. at 99–102, 123 S.Ct. 1140 (citing, *inter alia, Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (indefinitely barring participation in the banking industry); *Hawker v. New York*, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (permitting lifetime revocation of a medical license for conviction of a felony)). Moreover, the High Court refused to find an analogy between probation or parole and lifetime registration obligations, emphasizing the relative freedom of restraint on released sex offenders in that they are free to work and reside where they wish, provided they notify the relevant authorities as required.

Regarding whether the registration requirements were retributive, the Court found the lifetime duration of Alaska's more severe sanction to reflect nothing more than Alaska's "legitimate non-punitive purpose of public safety, which is advanced by alerting the public to the risk of sex offenders in their community." *Id.* at 102–03, 123 S.Ct. 1140 (internal quotation marks and modification omitted). The Court noted that

> Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism. The legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offend-

ers and their dangerousness as a class. The risk of recidivism posed by sex offenders is "frightening and high." *McKune v. Lile,* 536 U.S. 24, 34, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002); *see also id.* at 33, 122 S.Ct. 2017 ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault" (citing U.S. Dept. of Justice, Bureau of Justice Statistics, Sex Offenses and Offenders 27 (1997); U.S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983 at 6 (1997)).).

*Id.* at 103, 123 S.Ct. 1140 (citations modified).[32]

Most critically to the questions presented to this Court instantly, in *Smith,* the United States Supreme Court found the statute non-punitive notwithstanding the unavailability of any judicial relief from the various obligations that attached for the duration of a qualifying offender's life. *See* Alaska Stat. § 12.63.020. Even assuming that any particular offender might demonstrate his or her rehabilitation, "the legislature has power ... to make a rule of universal application," legislating "with respect to convicted sex offenders as a class, rather than requir[ing] individual determination[s] of their dangerousness." *Id.* at 104, 123 S.Ct. 1140. Focusing on the *lack* of individual assessment of future dangerousness under Alaska's mandatory system, the Court emphasized that, "in the context of [Alaska's] regulatory scheme[,] the State can dispense with individual predictions of future dangerousness and allow the public to assess the risk on the basis of accurate, nonprivate information about the registrants' convictions. . . ." *Id.* Noting that the excessiveness inquiry "is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy," the Court found that the regulatory means of the Alaskan

**32.** The Court also considered and rejected two other *Mendoza–Martinez* factors—whether the sanction is imposed only upon a showing of *scienter,* or whether the behavior to which it applies is already a crime—briefly in closing its discussion. Having already held in *G. Williams* that these factors do not militate in favor of finding the applicable SVP sanctions punitive in effect, 832 A.2d at 977–80, we need not revisit these factors.

statute were "reasonable in light of [the legislature's] nonpunitive objective." *Id.* at 105, 123 S.Ct. 1140. Thus, the Court found Alaska's Megan's Law non-punitive, despite its imposition of sanctions no less severe than those imposed by our Megan's Law II on offenders similarly situated to Pennsylvania's SVPs.[33]

Similarly, regarding the degree to which the means prescribed by the legislature fit the ends it cites as animating its legislation, this Court has vindicated the General Assembly's prerogative to deem certain sexual offenses so dangerous to the public at large that it warrants enacting a remedial scheme likely to err on the side of overinclusiveness. *See Maldonado,* 576 Pa. 101, 838 A.2d 710. In *Maldonado,* building upon our ruling in *G. Williams,* we considered whether constitutional due process requirements demanded that the determination of SVP status be proved beyond a reasonable doubt, rather than merely by the clear and convincing evidence called for by statute.

Noting preliminarily that an SVP designation "constitutes a significant imposition beyond the mere tarnishing of one's reputation, as it threatens the impairment and foreclosure of the associational or employment opportunities of persons who may not truly pose the risk to the public that an errant risk assessment would indicate," *Maldonado,* 838 A.2d at 714 (internal quotation marks omitted), we agreed that an offender's constitutional rights were implicated to a degree requiring constitutional due process scrutiny. We also cited the burden imposed on SVPs to attend at least monthly counseling ses-

---

33. Notably, Megan's Law in its current and prior forms *imposes* lifetime RNC requirements on defendants who have been individually assessed as SVP's as well as imposing registration and internet notification requirements on non-SVP offenders who have committed multiple Megan's Law predicate offenses carrying ten-year reporting requirements, *see* 42 Pa.C.S. § 9795.1(a)(ten-year predicate offenses), or who have committed single offenses specified for lifetime treatment, including rape, involuntary deviate sexual intercourse, sexual assault, aggravated indecent assault, and incest (victim under twelve years old). *See id.* § 9795.1(b). Thus, with respect to SVPs, Pennsylvania's statutory scheme provides more process than does Alaska's.

sions, at their own expense, for the duration of their lives as "an infringement beyond mere stigma." *Id.*

Reviewing our own caselaw and that of other jurisdictions, we noted that a burden of proof is designed to "instruct the factfinder as to the level of confidence that society believes he should have in the correctness of his conclusion," and that different standards reflect "how society believes the risk of error should be distributed as between the litigants." *Id.* at 715 (citing, *inter alia, Addington v. Texas,* 441 U.S. 418, 423–33, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). The clear and convincing standard, we continued, "requires evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Id.* (internal quotation marks and citations omitted).

Weighing the deprivations and burdens facing an SVP versus the societal interests at stake in the context of the SVP assessment, we held that those sanctions are more substantial than mere loss of money, thus elevating the stakes beyond those in which a mere preponderance of the evidence standard, which divides the risk of defeat equally between adversarial litigants, is thought to suffice. *See id.* at 715 (quoting *Addington,* 441 U.S. at 423, 99 S.Ct. 1804). Notably, we made the following observations regarding how wide the General Assembly might choose to sweep in protecting the public from the scourge of sexual crime:

> [W]e agree with the trial court that society has a significant interest in assuring that the classification scheme is not overinclusive, *i.e.,* that it does not brand as sexually violent predators those individuals who do not pose the type of risk to the community that the General Assembly sought to guard against. On the other hand, "[a]n erroneous under-classification could mean that the public would not be adequately informed about the presence of an offender in the community who poses a threat of committing a sexual offense. This would frustrate the purpose of the act because the public would have a reduced opportunity to protect those vulnerable to sexual offenders."

*Id.* (quoting *Doe v. Sex Offender Registry Bd.,* 428 Mass. 90, 697 N.E.2d 512, 519 (1998)). Thus, we held that it would be inappropriate and impracticable to require that the SVP criteria be established by proof beyond a reasonable doubt, and that the clear and convincing standard did not offend due process. We so decided in light of "the harm to the public of erroneous exclusion of a sexually violent predator, combined with the difficulty of satisfying the reasonable-doubt standard in the context of resolving the types of medical and psychiatric issues involved." *Id.* at 718.

Further illuminating the instant cases, albeit in a different connection, is this Court's recent decision in *Commonwealth v. Dengler,* in which we considered whether courts were bound to assess evidence offered in support of an SVP assessment in light of the *Frye* test, *see Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), which Pennsylvania courts apply to determine the admissibility of putatively novel scientific testimony.[34]

Reviewing concerns about the predictive value and the reliability of the SVP assessment conducted prior to incarceration, and thus potentially years before an offender's release, we clarified that *"the SVP assessment does not involve a prediction of recidivism but an assessment of risk given certain factors relevant to sex offenders." Dengler,* 890 A.2d at 378 (emphasis added). We also rejected the notion that the SVP assessment is diagnostic in the clinical psychological sense.

> The statute does not require proof of a standard of diagnosis that is commonly found and/or accepted in a mental health diagnostic paradigm.... [T]he opinion [rendered] in a sex offender assessment is not strictly diagnostic in the psychological sense; rather, [the assessor's] opinion must account for statutory factors, such as "the research, his behavior, his past records, his previous diagnoses," all of

---

**34.** Although this author filed a Concurring Opinion in *Dengler* expressing reservations regarding the sweep of the Majority's analysis, *see* 890 A.2d at 385 (Baer, J., concurring), the Majority Opinion's analysis now binds this Court.

which affect the opinion [the assessor] then forms and renders on the *statutory* question of SVP status.

*Id.* at 383 (quoting the testimony of a member of the SOAB). Thus, Megan's Law II's terminology, including "mental abnormality" and "sexually violent predator," are "terms of art," distinct from purely diagnostic terminology and the constraints imposed thereupon by clinical guidelines. *Id.* Although this analysis was directed only toward this Court's holding that the science underlying an SVP assessment is not "novel" for purposes of the *Frye* test, it informs Appellees' arguments in this case that the statute is punitively vague in connection with the SVP assessment process.

*Maldonado* and *Dengler* therefore militate against Appellees' and the trial courts' contentions that an SVP assessment has fatally diminished predictive value with respect to a prisoner who will spend years in prison following the assessment before being released into the community. Those cases also contradict the notion that any such diminished predictive value can dispositively warrant this Court ruling the assessment process unconstitutionally punitive by virtue of a supposed lack of correlation between the severity of the sanctions and the non-punitive intention of the legislature per the seventh *Mendoza–Martinez* factor. Finally, our refusal in *Dengler* to hold the SVP assessment up to the scrutiny of clinical diagnostic norms—which favor, *inter alia,* in-person examinations—resists Appellees' attempts to raise concerns based upon their Fifth Amendment rights against self-incrimination, which, admittedly, discourages offenders from cooperating in SVP assessments. Indeed, our ruling in *Dengler* in many respects can be read to have blessed as sufficient the "exhaustive list of factors" Megan's Law II sets forth to guide an SOAB assessor's determination as to whether an offender is an SVP.

This observation brings us back to the question at the heart of these cases: whether the absence of a robust, judicial avenue for an SVP to seek reassessment at or after his release from imprisonment to secure relief from the burdensome RNC provisions that attach for life to SVP status is unconstitution-

al.[35]   Because we have already determined in *G. Williams* that
the legislature intended the RNC provisions to serve civil,
remedial, and non-punitive ends, and furthermore because the
first six factors of the *Mendoza–Martinez* previously failed to
convince us that the provisions are punitive despite the legisla-
ture's contrary intent, our present inquiry hinges on whether
the absence of a comprehensive judicial remedy, viewed espe-
cially in light of the imperfections in the assessment process,
renders these provisions so overinclusive and excessive rela-
tive to the legislature's non-punitive objectives as to render
them punitive.

Because the legislature has promulgated a complex list of
policies served by these provisions, however, Appellees shoul-
ders a heavy burden in so arguing.   There is little question
that the threat to public safety and the risk of recidivism
among sex offenders is sufficiently high to warrant careful
record-keeping and continued supervision.   *See Smith*, 538
U.S. at 103, 123 S.Ct. 1140 (citing authorities).   Thus, a
showing by "the clearest proof" clearly requires more than
merely showing disagreement among relevant authorities.
*See G. Williams*, 832 A.2d at 973 (citing, *inter alia*, *Seling*, 531
U.S. at 261, 121 S.Ct. 727).   Appellees below submitted, and
both trial courts found persuasive, testimony and documentary
evidence casting doubt upon the accuracy, reliability, and
predictive value of the SVP assessment given its occurrence

**35.** The new, limited judicial reassessment procedure prescribed by
Megan's Law III applies by its plain terms to all SVPs, including those
whose assessments predated the enactment of that provision.   *See* 42
Pa.C.S. § 9795.5(b) ("An individual required to register under section
9795.1 who is a sexually violent predator may petition the sentencing
court for release from the application of section 9798...."").   The trial
court, in deciding *Drain*, disagreed, *see Drain* Tr. Ct. Op. II at 6, but
provided no analysis or citation to authority justifying any departure
from § 9795.5's unequivocal language regarding to whom the proce-
dure is available.   In any event, the limited judicial recourse provided
by § 9795.5 offers no relief from the regular and strict registration
requirements, the stigmatizing internet provisions, and the mandatory
monthly counseling requirement that apply to SVPs for the durations of
their lives.   Thus, we agree with the trial court's *dictum* to the effect
that assuming § 9795.5 applies to all SVPs, it does not sufficiently
ameliorate Appellees' asserted deprivation to an extent rendering their
constitutional claims moot.

prior to sentencing and incarceration, and given empirical findings finding a diminished risk of recidivism among offenders as they age. Even if we take these studies at face value and assume their scientific validity, however, all they provide is a counter-narrative to the evidence that the General Assembly relied upon in gauging the necessity and formulating the provisions of Megan's Law, which also is supported by empirical evidence and numerous studies. *See, e.g., Smith,* 538 U.S. at 103, 123 S.Ct. 1140.

Where, as here, questions pertaining to the validity and utility of a given hybrid assessment with both statutory and diagnostic aspects lead only to the conclusion that reasonable minds differ regarding its predictive value and social utility, it manifestly is not the case that one party has proven the other's error by "the clearest proof." In these cases, the trial courts had insufficient evidence to conclude that Appellees met their burden to demonstrate that the remedial regime in question is so unreliable, or so prone to error over time, and thus so deficient given the lack of a comprehensive judicial reassessment mechanism, that the RNC provisions are constitutionally punitive and warrant treatment per the United States Supreme Court's decisions in *Apprendi* and progeny.

### III. Conclusion

In *G. Williams* this Court invited challengers to marshal their evidence that the SVP assessment process is sufficiently flawed that the lifetime RNC burdens triggered by that assessment amount to punishment. This, we observed, would require a showing that the definition of "sexually violent predator" is "incapable of reasonably precise implementation." *G. Williams,* 832 A.2d at 982. We also suggested that the Court would not be unreceptive to the related argument that the predictive limitations of the statutory assessment procedure demanded a meaningful opportunity to challenge that assessment in a judicial forum to maintain its fundamentally remedial character. We emphasized, however, that this would require the challenger to establish that "given sufficient time and/or treatment, sexually violent predators *can be fully cured*

*of the 'mental abnormality or personality disorder [making them] likely to engage in predatory sexually violent offenses."* 832 A.2d at 983 (emphasis added).

Appellees before us face a difficult argument with respect to the first point, especially in the immediate wake of our decision in *Dengler*, approving the statutory SVP criteria as nonclinical, statutory factors well-fashioned in light of the legislature's public safety-driven intention. With respect to the second point, Appellees' showing that reasonable people disagree about the likelihood of recidivism as an offender ages is very different than demonstrating the potentiality of the full cure we alluded to in *G. Williams*. Moreover, *Maldonado* and *Smith* taken together stand for the proposition that overinclusiveness is not dispositive where the danger posed to society is so great.

█ "The clearest proof" required to demonstrate that the sanctions have a punitive character notwithstanding the legislature's contrary intent cannot be satisfied merely by providing evidence militating in favor of a more generous account of the likelihood of rehabilitation than that found by the General Assembly in originally fashioning its legislation requiring registration of sex offenders. That is all the Appellees provided the trial courts in this case, and thus is insufficient to warrant application of the due process protections required under *Apprendi*.

For the foregoing reasons we hold that the RNC provisions that attach to sex offenders assessed to be SVPs are not constitutionally punitive, and require no more process than the statute currently provides. The lower courts' orders are reversed and the cases remanded for further proceedings consistent with this Opinion.

Former Justice NEWMAN did not participate in the decision of this case.

Chief Justice CAPPY, and Justices CASTILLE, SAYLOR, EAKIN and BALDWIN join the opinion.